**RIORDAN v. FERGUSON, Federal Housing Administrator, (INTER–COUNTY TITLE GUARANTY & MORTGAGE CO., Third-Party Defendant).**

No. 109.

Circuit Court of Appeals, Second Circuit.

Feb. 14, 1945.

---

CLARK, Circuit Judge, dissenting in part.

See also D.C.S.D.N.Y., 42 F.Supp. 47; D.C., 2 F.R.D. 349.

Herbert Noble, Jr., of New York City (Irving M. Engel and Dan Gordon Judge, both of New York City, on the brief), for plaintiff-appellant.

Stuart Z. Krinsly, Asst. U. S. Atty., of New York City (John F. X. McGohey, U. S. Atty., of New York City, on the brief), for defendant-appellee.

James G. Mitchell, of New York City (Mitchell & Phelan, of New York City, on the brief), for third-party defendant-appellee.

Before SWAN, CLARK and FRANK, Circuit Judges.

PER CURIAM.

Plaintiff, as ancillary administrator with the will annexed of his father, John J.

Riordan, Jr., who died in 1939, sued in the Supreme Court of the State of New York for the foreclosure of a mortgage given his father June 30, 1924, by Merchants & Manufacturers Exchange of New York. The mortgage covered, among other things, several pieces of real estate in Westchester County, New York; and the action involves one of these pieces, which had been acquired by defendant Ferguson as Federal Housing Administrator upon default of an insured F. H. A. loan secured by a mortgage on the property. The Administrator removed the action to the District Court, and then brought in, as third-party defendant, Inter-County Title Guaranty & Mortgage Company, which had insured the title of the property in the sum of $8,600. Both defendants answered and defended on the merits. After a trial the court dismissed the action and this appeal followed.

The mortgage in question, which was duly recorded in the land records, recited that it was made to secure a loan of $215,000, "payable $100,000.00 in 30 days, balance thereafter on demand, with interest at 6 per cent." With the mortgage Riordan received the mortgagor's promissory note, reciting these same terms, but adding also that the mortgaged property was to be held as security not only for the payment of the note, but also for "all other present or future debts, claims or demands of any and all kind of the holder against the maker." The note was not recorded, and no reference to the mortgage appears in later deeds in defendant's chain of title. On December 10, 1925, the mortgagor gave to Philso Estates, Inc., a New York corporation, two full covenant warranty deeds, neither making mention of the mortgage, both executed on behalf of the mortgagor corporation by its president "by order of the Board of Directors." One of these deeds included, among other parcels, the land now in suit; the other conveyed other property covered by the mortgage. The latter property was thereafter involved in litigation on which is based the defense of res judicata, discussed below. The execution of the deeds also is made the ground of the defense of estoppel, since Riordan at that time—indeed from 1923 until late 1926 —was a director of the mortgagor-grantor.

In addition to the two defenses just noted, the defendants had raised the defense of lack of jurisdiction of the person of the Administrator and of the subject of the action, and the further defenses of the statute of limitation and laches, and of payment. Prior to the trial the court ruled that it had jurisdiction and declined to enter summary judgment on the other defenses, D.C.S.D.N.Y., 42 F.Supp. 47. Thereafter the case came on for trial before another district judge, where all the defenses were reiterated, with the issue of payment naturally occupying the most space in the printed record. That issue involved subordinate questions as to whether there was an account stated, as claimed by plaintiff, as to how far payments made were to be applied to the mortgage note or to other indebtedness, and as to the reconciling of detailed and involved accounts, covering not only loans and discounts, but also agency commissions, and illuminated by the conflicting testimony of expert accountants. The mortgagor had gone into bankruptcy in 1927, receiving its discharge the following year. Its books and papers have been destroyed, but certain transcripts of the Riordan account, together with a personal account book and other material of Riordan, were introduced and were a fruitful source of conflict between the parties. The court overruled all defenses but that of payment; on that it made detailed findings supporting its conclusion that the mortgage was paid in full.

The claim of lack of jurisdiction is based upon the well-known immunity of the United States and its instrumentalities from suit, Cunningham v. Macon & B. R. Co., 109 U.S. 446, 3 S.Ct. 292, 609, 27 L. Ed. 992; Federal Land Bank of St. Louis v. Priddy, 295 U.S. 229, 55 S.Ct. 705, 79 L.Ed. 1408; Missouri Pac. R. Co. v. Ault, 256 U.S. 554, 41 S.Ct. 593, 65 L.Ed. 1087; The Lake Monroe, 250 U.S. 246, 39 S.Ct. 460, 63 L.Ed. 962, buttressed by the contention that here the land transferred on the mortgage default is really owned by the United States and hence is not subject to execution or suit. The National Housing Act, 12 U.S.C.A. § 1702, expressly authorizes the Administrator "to sue and be sued in any court of competent jurisdiction, State or Federal"; but appellees rely on statements in Federal Housing Administration, Region No. 4, v. Burr, 309 U.S. 242, 250, 60 S.Ct. 488, 493, 84 L.Ed. 724, where the Court, in holding the Administrator subject to garnishment by a judgment creditor of the wages due his employee, went on to say: "That does not, of course, mean that any funds or property of the United States can be held responsible

for this judgment." This claim is not without force. For all substantial purposes the land is now an asset of the United States; and United States v. Summerlin, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283, holds directly that a claim against the estate of a deceased assigned to the Administrator "became the claim of the United States, and the United States thereupon became entitled to enforce it." And where the United States is the owner of record, 28 U.S.C.A. § 901, allowing suit to secure an adjudication concerning a mortgage, lien, or other claim on realty of the United States, does not apply. Sissman v. Chicago Title & Trust Co. et al., 303 Ill.App. 620, 25 N.E.2d 599.

But such a conclusion would seem at variance with the purposes of the Act. It would make the business carried on by the Administrator subject to various complications and restrictions of a hampering nature; and it would definitely prejudice prior lienors, who had not been able to foreclose their liens before the United States acquired full title to the property, by leaving them to remedies at best uncertain, indefinite, and undetermined. As said by the Court in the Burr case, supra, 309 U.S. at page 245, 60 S.Ct. at page 490, 84 L.Ed. 724: " * * * it must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue or be sued,' that agency is not less amenable to judicial process than a private enterprise under like circumstances would be." The Court also said: "Claims against a corporation are normally collectible only from corporate assets. That is true here. Congress has specifically directed that all such claims against the Federal Housing Administration of the type here involved 'shall be paid out of funds made available by this Act (chapter).' § 1 [12 U.S.C.A. § 1702]. Hence those funds, and only those, are subject to execution." And it is to be noted that the Housing Act itself gives recognition to "real property acquired and held by the Administrator" under the Act, in its careful provisions that such real estate shall not be tax exempt, 12 U.S.C.A. § 1714 of the original Act, and the added section of 1941, 12 U.S.C.A. § 1706b, dealing with property held in connection with the payment of insurance granted under the Act. We think the construction made by the court below more consistent with practical needs of the Administration and more probably the Congressional intention. See Reconstruction Finance Corp. v. J. G. Menihan Corp., 312 U.S. 81, 61 S.Ct. 485, 85 L.Ed. 595.

■ The defense of res judicata is based upon an action brought by Philso Estates, Inc., in the Supreme Court of New York for Westchester County in April, 1930. Riordan in 1928 asserted a claim on the mortgage in the sum of $60,000, and Philso, who then had agreed to sell the land acquired by it by the second deed of December 10, 1925, to purchasers for $55,000, bought its release from Riordan on October 26, 1928, for $29,631.32.[1] Philso thereupon brought the state suit against Riordan and the New York Title and Mortgage Company, insurer of the title, for a declaratory judgment that the amount paid was for a valid lien, and for consequential damages from the title company of this amount and interest. The trial court held that a declaratory judgment would not lie; but this was reversed on appeal. Philso Estates, Inc., v. Riordan, 240 App.Div. 998, 268 N.Y.S. 265. Thereafter the action went to trial February 8, 1934, on answers of Riordan supporting Philso's claim and of the title company opposing it. In due course the trial court rendered its decision finding that the mortgage had been fully paid long prior to the settlement of 1928 and directing judgment for the title company dismissing the complaint; and judgment was so rendered February 4, 1935, from which both Philso and Riordan appealed. But a stipulation of the parties dated March 10, 1936, provided for discontinuance of the appeals by the Appellate Division, Second Department; and on May 15, 1936, there was entered the order of the Appellate Division discontinuing the appeals on consent of both appellants.

Notwithstanding the fact that only the appeals were discontinued, plaintiff relies

---

[1] In advance of trial defendants called upon plaintiff under Federal Rules of Civil Procedure, rule 36, 28 U.S.C.A. following section 723c, to admit that Riordan released Philso "of all indebtedness due and payable to him thereby," to which plaintiff merely replied: "Admitted, except that it is denied that the said corporation was released of all indebtedness." This is not the specific response directed by Rule 36(a); and, so far as important, the quoted matter may be deemed admitted.

987

on other facts to show an intent of the parties for abandonment of the entire action and vacation of the judgment. While the appeals were pending, the title company was taken over for liquidation by the State Superintendent of Insurance in a proceeding brought in the Supreme Court of New York County. On March 10, 1936, the Superintendent of Insurance, as liquidator of the title company, entered into a settlement agreement with the two appellants pursuant to authorization granted by the Supreme Court in the liquidation proceeding. This agreement, after reciting the judgment of February 4, 1935, the pendency of the appeals therefrom, and the filing of claims in the liquidation proceeding by Philso and its attorneys, to whom 25% of its claim had been assigned, for the full amount of the sum ($29,631.32) paid to Riordan in satisfaction of his mortgage lien, provided that the claims should be allowed in the amount of $15,000 for Philso and $5,000 for its attorneys, and that the title company and its liquidator should be released from all further liability on the title policy. The parties further agreed to execute "such stipulations or other papers as may be necessary * * * for the purpose of discontinuing the appeals * * * and such other papers as may be necessary and requisite to discontinue said action and terminate all litigation with reference to said title insurance policy." A majority of the court agrees with the district judge that "The effect of this agreement was to annul the judgment." Regardless of failure to vacate the judgment of record, the parties treated the judgment as a nullity, for they recognized the validity of Philso's claim by allowing it as a general claim to the extent of $20,000. Since the agreement caused the judgment to cease to be binding on Philso, the judgment would likewise cease to be effective against any one in privity with Philso. Hence we find it unnecessary to consider the District Court's further ruling that there was no privity between any of the parties to the Philso action and the present defendants.

Turning now to the defense of payment, the plaintiff's attempt to overcome this by proof of an account stated clearly fails. For it is nowhere shown that Bolton, who bore the extravagant title of "internal auditor" and who signed the letters containing acknowledgments of Merchants & Manufacturers Exchange's indebtedness to Riordan, which letters comprise the alleged account stated, had the authority to bind the corporation in any way. Plaintiff's further claim that the District Court erred in failing, in the absence of specific earmarkings, to allocate payments first to the unsecured items of indebtedness, is clearly without merit, since the entire debt was secured. For it appears from the record that an agreement, dated April 30, 1926, whereby M. & M. E. assigned to Riordan all moneys due it from the Park-Lexington Corporation, was to serve as collateral security not only for the specific items of indebtedness therein described, but also for all past and future debts owed by M. & M. E. to Riordan. As between secured debts, the allocation of payments to antecedent items of the account in the order of their priority is clearly correct. Thompson v. St. Nicholas Nat. Bank, 113 N.Y. 325, 21 N.E. 57, affirmed 146 U.S. 240, 13 S.Ct. 66, 36 L.Ed. 956. The rest of the points raised by plaintiff as objections to the District Court's finding of payment concern questions of fact, and we accept the trial court's findings as to those items determined to be either doubtful or earmarked or unearmarked.

But the District Court erred in holding that there was no evidence to support two items of indebtedness claimed by plaintiff, consisting of commissions in the sums of $55,000 and $20,000 for the sale of Park-Lexington and Vanderbilt Avenue Building bonds respectively. For it appears that these items are entered in M. & M. E.'s own ledger books under date of December 31, 1924, a fact which the District Court must have overlooked. Though this date is after the execution of the mortgage, a letter by Catts, president of M. & M. E., and entries in Riordan's books indicate that these items antedated the mortgage. If that is actually so, and payments are accordingly applied first to these items, then it would seem that on the District Court's own view the mortgaged indebtedness has not been fully paid. Since, however, the court did not find it necessary to pass upon all the items of account, we shall not attempt final disposition of this issue, but shall remand it for determination below upon a more complete statement of the debits and credits.

The remaining issues may be disposed of quickly. The action being for the foreclosure of a mortgage, it is not barred by the statute of limitations on the debt secured thereby, Hulbert v. Clark, 128 N.Y.

295, 28 N.E. 638, 14 L.R.A. 59; House v. Carr, 185 N.Y. 453, 78 N.E. 171, 6 L.R.A., N.S., 510, 113 Am.St.Rep. 936, 7 Ann.Cas. 185; Brooklyn Bank v. Barnaby, 197 N.Y. 210, 226, 90 N.E. 834, 27 L.R.A.,N.S., 843; see also Jones on Collateral Securities, 3d Ed., § 581, nor may the defendants avail themselves of the defense of laches. Monroe County Sav. Bank v. Baker, 147 Misc. 522, 264 N.Y.S. 101. The further defense of estoppel based only on the fact that Riordan was a director at the time the president of the mortgagor company executed warranty deeds of conveyance of the mortgaged premises seems to us properly not sustained. We need not come to the interesting question how far a director acting in his representative capacity may create a personal estoppel against himself, for we think the president's declarations that he executed the deeds "by order of the Board of Directors" were no more than the declaration by an agent of his own authority, which would not conclude the principal. Here the authorization in not unusual business practice may well have been to execute the instruments needed under the circumstances, i.e., those which would convey the company's actual title; it seems extreme now to guess or infer that the deceased actually and knowingly authorized a conveyance which did not except the mortgage whose enforcement he was found pressing so strenuously for many years thereafter.

■■■ The action must, therefore, be remanded for further consideration of the issue of payment in accordance with the views expressed in this opinion. There is no need of a complete retrial, however; the district judge who originally heard the case may proceed with the trial upon the basis of the evidence heretofore adduced and such further evidence as may now be pertinent, in accordance with the practice outlined in Gulbenkian v. Gulbenkian, 2 Cir., 147 F.2d 173.

Reversed and remanded.

CLARK, Circuit Judge (dissenting from so much of the opinion as rejects the defense of res judicata, and from the judgment).

The defense of res judicata is universally respected, but actually not very well liked. The obvious public interest against protracted retrials of matters already fairly settled and the private interest in relying on the protection of final judgments require some obeisance to the defense in principle; but tenderness for a supplicating litigant stays the judicial hand from its forthright application. Undoubtedly the general modern trend of making allowances for procedural mistakes plays its part, though actually it should lead to more, rather than less, respect for the principle. The small chance nowadays that an action may ultimately go wrong for mere procedural defects should induce greater confidence in the judgment ultimately rendered. And recent decisions of the Supreme Court require a healthy respect for judgments as settling not only the issues presented, but those which should diligently have been presented. Stoll v. Gottlieb, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104; Chicot County Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329; American Surety Co. v. Baldwin, 287 U.S. 156, 53 S.Ct. 98, 77 L.Ed. 231, 86 A.L.R. 298. Nevertheless the judicial tendency is still to constrict the doctrine within narrow limits.

The present case seems to me one where practicalities, as well as the law, call for the application of the doctrine. The claim now sued on is over twenty years old. Since the main issue is whether the claim, admittedly originally good, has been satisfied long since, difficulties of proof from the passage of time obviously bear hardest on innocent defendants purchasing the land without knowledge of the claim. The trial here beautifully illustrates the point; conflicting testimony of expert accountants dealing with fragmentary records of a company bankrupt seventeen years ago has led not unnaturally to errors on the part of the trial judge requiring a retrial, though apparently no one doubts that equitably the claim should be considered satisfied. And we are told that there are several more suits already pending or about to be brought against other similar purchasers. But it appears that four years after the debt became due, the creditor did make a claim against a then innocent purchaser, was paid a substantial sum, and, so far as the record shows, was thereafter satisfied throughout his lifetime. The present litigation on the claim was commenced only some years after his death by his personal representative. More important, the grantee which thus bought its peace from him proceeded to settle the very issue of payment by a suit against him and its own surety, which was tried on the merits on that point and in judgment ten years ago, when the mat-

ters were considerably fresher than they are now. I think that should have ended the litigation.

My brothers find the effect of that judgment destroyed by later acts in settlement of the claim made. But it seems to me clear that these acts in intent, as well as in fact, led only to the withdrawal of the appeals. The attorney for the State Superintendent of Insurance who drew the papers testified at the trial below. He stated that he prepared both the agreement of the parties and the stipulation for discontinuance of the appeals at one time as carrying out the authorization for settlement, that he forwarded them to opposing counsel, that they were returned to him duly executed and without suggestion of any kind, and that there was never any discussion with reference to vacating the judgment. If the agreement itself could be considered ambiguous, this shows a contemporaneous construction and action—in the first instance by the attorney most concerned, but thereafter concurred in by all the parties without question—in discontinuing *the appeals* only, upon a stipulation which provided that with its filing "with the Clerk of the Appellate Division, in and for the Second Judicial Department, an order discontinuing the said appeals may be entered by said Court, without further notice to any of the undersigned." And this order of discontinuance was *in the appellate court,* the only notation in the trial court being the docket entry, immediately following that of the notices of the appeals: "5/15/36 Order by App.Div., on consent of both Appellants discontinuing appeal." Certainly any one examining these court records would have had no reason to doubt that only the appeals were withdrawn, and would not be put on notice of any agreement affecting the judgment.

But even if the agreement is to be given an overriding effect, I believe that, in the light of the circumstances, it cannot properly be construed as at variance with the stipulation. It refers throughout to the *appeals* pending in *this particular appellate court;* and the provision relied on by my brothers itself calls for the execution of necessary papers "for the purpose of discontinuing the appeals heretofore referred to herein, now pending in the Appellate Division of the Supreme Court in and for the Second Judicial Department." Entirely consistent with this reference is the further provision "and such other papers as may be necessary and requisite to discontinue said action and terminate all litigation with reference to said title insurance policy." It will be noticed that, except possibly for the words "discontinue said action," the rest of the provision and of the sentence is clearly to be construed as referring to a termination of the litigation at its then stage. My brothers, I think, are attributing some technical meaning to "discontinue" as signifying a withdrawal from the beginning, or a vacatur of the judgment, rather than an ending of the appeals; but I can find no support for such a meaning in either lay or legal discourse. The word means only the affirmative action of a party in terminating a judicial proceeding affecting him without pressing it to a conclusion, as distinguished from action by the court in *dismissing* a proceeding. Cf. "discontinuance" in Webster's New International Dictionary, 2d Ed. Unabridged, 1939, and in earlier editions, as in that of 1918. Furthermore, it has no such established meaning that it cannot take color from the circumstances where it is used. Thus an agreement by a winning litigant after a judgment has been rendered to give up the benefit of the judgment and discontinue the action is clear in intent;[1] certainly it would seem to have a different meaning from an agreement by *all* the parties—two appellants and one appellee—to discontinue an action pending on appeal in a named appellate court. By itself an agreement of the latter form would seem to point to only a termination of the case on appeal; when coupled with a stipulation for dismissal of the appeals only, carried out by such a dismissal, the conclusion to this effect seems to me quite irresistible.

It is suggested, however, that the Superintendent had allowed proof of a general

[1] As in Deen v. Milne, 113 N.Y. 303, 308, 309. 20 N.E. 861, 863, cited by the judge below, though it was a case where "the conceded condition of the case then on trial in the Supreme Court shows overwhelmingly" that the agreement was intended to remove the bar of the earlier judgment, so that the trial might go forward. So Loeb v. Willis, 100 N.Y. 231, 3 N.E. 177, also cited below, concerned only a stipulation for discontinuance in the trial court before final judgment; and cf. also Mahon v. Remington, 256 App.Div. 889, 9 N.Y.S.2d 47; Brown v. Cleveland Trust Co., 233 N.Y. 399, 405, 406, 135 N.E. 829; Hempy v. Griess, 30 App.Div. 434, 51 N.Y.S. 1072, 1074.

claim against the insolvent title guaranty company as though the judgment were vacated. This seems inaccurate. The settlement agreed upon permitted proof of a general claim against the insolvent estate for considerably less than one-half the then face value of the claim. But clearly the parties realized that it was for much less, probably hardly more than a formal settlement to end litigation, in view of the hopeless insolvency of the company; as we were told, even yet nothing has been paid on general claims. Under the circumstances and with the terms of settlement made perfectly clear in the papers and in the order of the court which was in control of the liquidation, no reason is apparent why the Superintendent's counsel should have bothered to press for vacation of this judgment in the trial court; and his testimony shows that he actually saw none. On the other hand, Philso did have some interest in preserving at least that judgment if it could get no more. In cold fact Riordan was the only one who would have any real interest in erasing the judgment, and the testimony is clear that he never made a move in that direction—a fact which speaks volumes as to the amount of life he thought was left in the claim. In my opinion, therefore, the judgment of the New York Supreme Court that the mortgage was paid prior to 1928 stands as unimpaired as when rendered.

The District Court further held that there was no privity between any of the parties to the former action and the present defendants, and hence that the present action was not within any of the recognized exceptions to the general rule requiring the estoppel of a judgment to be mutual, citing Good Health Dairy Products Corp. of Rochester, N. Y., v. Emery, 275 N.Y. 14, 9 N.E.2d 758, 112 A.L.R. 401; Bigelow v. Old Dominion Copper Mining & Smelting Co., 225 U.S. 111, 32 S.Ct. 641, 56 L.Ed. 1009, Ann.Cas.1913E, 875; Portland Gold Mining Co. v. Stratton's Independence, 8 Cir., 158 F. 63, 16 L.R.A.,N.S., 677. Since my brothers have agreed with the trial court on the first point, they have found it unnecessary to consider this second point. But I must discuss it, because my vote for affirmance of the judgment below rests on a rejection of this conclusion of law also.

The issue as to mutuality of estoppel should be determined by state law, Kearns Coal Corp. v. United States Fidelity & Guaranty Co., 2 Cir., 118 F.2d 33, certiorari denied 313 U.S. 579, 61 S.Ct. 1099, 85 L.Ed. 1536; Caterpillar Tractor Co. v. International Harvester Co., 3 Cir., 120 F.2d 82, 85, 139 A.L.R. 1, and therefore requires an interpretation of recent New York decisions. The two leading cases in the Court of Appeals are the Good Health case, supra, by a unanimous court, allowing a defendant, owner of a car driven by her son, the protection of an earlier judgment *in his favor*, and Elder v. New York & Pennsylvania Motor Exp., 284 N.Y. 350, 31 N.E.2d 188, 133 A.L.R. 176, reversing 259 App.Div. 380, 19 N.Y.S.2d 553, with two judges dissenting, reversing an affirmative judgment for personal injuries in favor of a truck driver against the owner of a truck with which he had collided, because it was based only on a prior judgment of his principal for property damage against this same defendant. Both cases undertook to state and follow the "apparent exception" to the requirement of mutuality in estoppels by judgment—variously expressed as that of exoneration of a person whose liability is "altogether dependent upon the culpability of one exonerated in a prior suit, upon the same facts when sued by the same plaintiff," or "where the relation between the defendants in the two suits has been that of principal and agent, master and servant, or indemnitor and indemnitee"—citing and quoting the Bigelow case, supra, 225 U.S. at pages 127, 128, 32 S.Ct. at pages 642, 643, 56 L.Ed. 1009, Ann.Cas.1913E, 875, which, in turn, cites the Portland Gold Mining Co. case, supra.

As I shall point out later, I believe the earlier judgment is to be held res judicata here under the New York authorities, because Philso, a party to it, was a predecessor in interest of the present title holders. It will be recalled that on December 10, 1925, the mortgagor conveyed to Philso by separate deeds both the realty here in suit and the realty described in Philso's action. But first it should be noted that, could we but be sure of either of two facts unfortunately left in doubt on this record, the estoppel of the judgment would be quite clear under even the strictest requirements of mutuality. First, we do not know whether Philso still owned the property here involved at the time of the earlier action. We know only that by November 3, 1937, this parcel was owned by one Tonjes and wife, for they then borrowed the money and executed the mortgage which led in due course to the acquisition of title by the defendant Ad-

ministrator. Clearly if Philso owned this parcel at the time of its judgment, it and takers from it, in direct privity with it, would have the advantage of the holding that the mortgage was paid. Restatement, Judgments, 1942, § 90; cf. Illustrations 4, 6, 8, pp. 449, 450; W. A. S., Res Judicata with Reference to Persons Neither Parties nor Privies, 57 Harv.L.Rev. 98, 100; Tillman v. National City Bank of New York, 2 Cir., 118 F.2d 631, 634, certiorari denied 314 U.S. 650, 62 S.Ct. 96, 86 L.Ed. 521.[2] Second, we do not know whether Philso conveyed this parcel with covenants of warranty, although it did so convey the other parcel, and there is no mention of the mortgage in defendant's chain of title. If, as seems probable, Philso did warrant the title, it would then be clearly a full "indemnitor" in the terms of the rule as stated by the authorities.

Hence, in my judgment, reversal at most should be only for the purpose of securing clear findings on these two points thus decisive of the issue and of the case. But a reading of the New York precedents, including lower court cases applying the decisions of the Court of Appeals, leads me to conclude that they apply the so-called indemnitor-indemnitee exception to the mutuality rule to include parties much less closely related than Philso and the present title-holders are shown to be even on the present record. Accordingly I turn to a consideration of that rule and its development in New York.

That there has been increasing discontent with the mutuality rule is perhaps an understatement. When a person has once thoroughly litigated his claims and lost, it does not seem appropriate that he should have another chance to relitigate that same issue, even as against another. Hence reaction against overstrict application of the mutuality principle is quite general. It has taken the course either of construing liberally the recognized exception for those primarily and secondarily liable—master and servant, principal and agent, and indemnitor and indemnitee—or, in some cases, of urging still more broadly that, whenever a contender has lost on a full and fair trial of an issue, he should not be able "to reopen identical issues by merely switching adversaries." Bernhard v. Bank of America Nat. Trust & Savings Ass'n, 19 Cal.2d 807, 812, 122 P.2d 892, 895; Perkins v. Benguet Consolidated Mining Co., 55 Cal.App.2d 720, 132 P.2d 70; Coca-Cola Co. v. Pepsi-Cola Co., 36 Del. 124, 6 W.W. Harr. 124, 172 A. 260; Cohen v. Superior Oil Corp., D.C.Del., 16 F.Supp. 221, 225, affirmed 3 Cir., 90 F.2d 810, certiorari denied 302 U.S. 726, 58 S.Ct. 47, 82 L.Ed. 561; Note, 35 Yale L.J. 607; and compare also the interesting law review comments on the recent New York cases.[3]

Arguments for a more limited estoppel stress practicalities and the frailties of human nature, suggesting that a litigant, out of consideration for his opponent or for other personal reasons, may not have pressed his first case to the utmost. Von Moschzisker, Res Judicata, 38 Yale L.J. 299, 303. But these considerations are certainly as strongly operative in the admitted exception to the mutuality rule, and may be thought to be somewhat exaggerated at best and in any event not adequate to offset the public and private interest that there be a limit to the number of opportunities for trial of the same issue of facts. Under any rule yet announced, even the frank and direct rule of the Coca-Cola

---

[2] Perhaps ownership up to the time of the judgment is not necessary. In the comment cited, 57 Harv.L.Rev. 98, Professor Seavey discusses the question whether protection of a judgment may date back to the institution of the action, and holds that it may, for those acquiring property involved in an action, on the theory of transfer of title by the judgment. Restatement, Judgments, 1942, §§ 89, 110. Nevertheless he applies the rule to approve Bernhard v. Bank of America Nat. Trust & Savings Ass'n, 19 Cal.2d 807, 122 P.2d 892, where a later probate judgment was held to protect a bank in permitting withdrawals from what was originally an agency account (i.e., a debt from the bank) transferred to a personal account on a claim of gift from a deceased, as the judgment ultimately found. Here even a quitclaim by Philso, pending action, might well be held to contemplate a transfer by the grantor of whatever immunity, or other legal relation, the action might find to attach to the debt owed Riordan—a point adverted to at the end of my dissent, below.

[3] For views urging generous limitations upon the doctrine of mutuality, see 10 Fordham L.Rev. 105, 18 N.Y.U.L.Q.Rev. 565, 23 Ore.L.Rev. 273, 14 St. John's L.Rev. 427, 91 U. of Pa.L.Rev. 467, 15 U. of Cin.L.Rev. 349, 27 Va.L.Rev. 955, 2 Wash. & Lee L.Rev. 233; for views going less far, see 8 Brooklyn L.Rev. 224, 54 Harv.L.Rev. 889, 15 Temp.L.Q. 558, cf. 27 Corn.L.Q. 124.

and similar cases, judicial solicitude for faltering litigants is more than likely to prevent anything fairly approaching harshness, particularly in the light of the settled rule that "collateral estoppel" is limited strictly to the specific subject matter actually fully litigated. Restatement, Judgments, 1942, § 90.

As a matter of fact, the exception so universally recognized tends to make the issue turn on distinctions of degree rather than of kind. Limitation of the exception to those "secondarily liable" is obviously not justified on the authorities, if any technical content is to be given those words. The law of suretyship will take care of cases which involve definite agreements of a surety or guaranty nature, without resort to this doctrine; and yet neither that law nor any other does provide, as *a matter of course,* for reimbursement of a principal by his agent, of a master by his servant, or of a mother by a son or other owner of a car by the driver thereof, as in the Good Health case, supra. About all we can fairly say is that reimbursement seems potentially possible as an abstract legal proposition, depending, however, on facts concerning the relationship of the parties which are as yet unknown, although as a practical matter it is highly unreal and unlikely, particularly in the family car situation of the Good Health case.

Moreover, the clear weight of authority, indeed the almost universal view, is that the benefit of the estoppel may go to either the so-called indemnitee, or the indemnitor, where the other has obtained the prior judgment, in spite of the arguments of the strict constructionists that protection only to the person "secondarily" liable is logically justified. See cases cited by Professor Seavey, supra, 57 Harv.L.Rev. at page 104, and in Restatement, Judgments, Proposed Final Draft (Part II), 1942, p. 9; Giedrewicz v. Donovan, 277 Mass. 563, 569, 179 N.E. 246, 248. Professor Seavey himself, the Reporter for the Judgments Restatement, though favoring the more restricted rule, cf. Restatement, Judgments, 1942, §§ 93, 96, 97, thus felt compelled to add other provisions extending the exception, as in §§ 99, 100. Especially interesting is § 99, stating that a judgment on the merits in favor of a person guilty of a tort or

breach of contract is a bar to an action by a plaintiff against another responsible for the conduct of such person if the action is based solely upon the tort or breach of contract by such person, *whether or not the other person has a right of indemnity.* Perhaps not without significance is the fact that the early leading cases defining the exception avoided such limitations on the exception and stated it broadly upon the general moral and policy grounds of "the injustice which would result in allowing a recovery against a defendant for conduct of another, when that other has been exonerated in a direct suit." Compare the Bigelow case, supra, 225 U.S. at page 128, 32 S.Ct. at page 642, 56 L.Ed. 1009, Ann. Cas.1913E, 875.

In New York, Liberty Mut. Ins. Co. v. George Colon & Co., 260 N.Y. 305, 312, 183 N.E. 506, cf. Note, 46 Harv.L.Rev. 858, had affirmed a broad view in allowing an insurance carrier of an employer to recover affirmatively against a third person on the basis of a prior recovery by the administratrix of the employee for wrongful death. But the Good Health case, supra, 275 N.Y. at page 18, 9 N.E.2d at page 759, 112 A.L.R. 401, went still further in saying that "one who has had his day in court should not be permitted to litigate the question anew"; and it was followed in Byrne v. Hasher, 275 N.Y. 474, 11 N.E.2d 304. Then came the Elder case, supra, 284 N.Y. at page 353, 31 N.E.2d at page 190, 133 A.L.R. 176, where the court pointed out that in the Good Health case the plea was used only defensively and that to carry it to the point taken below of justifying *affirmative* recovery "would eliminate entirely the requirements of mutuality of estoppel and of privity." Judges Lewis and Rippey, however, argued persuasively for the view which had been sustained below. And in the Kearns case, supra, we applied the rule defensively, recognizing the limitation stated against the considerably further step of using the former finding as the basis of an affirmative judgment against the third party.

The Court of Appeals has not had occasion to clarify the doctrine further, but the lower court decisions do not restrict it.[4] Most important are the New York cases repeatedly applying the protection of

---

[4] Cf., e.g., Romeo v. Western Express Co., Sup., 45 N.Y.S.2d 297; Heller v. Schwarz, 179 Misc. 911, 40 N.Y.S.2d 314; and Daly v. Terpening, 261 App.Div. 423, 26 N.Y.S.2d 160, affirmed 287 N.Y. 611, 39 N.E.2d 260. In general, see Patterson, J., in American Surety Co. of New York v. Singer Sewing Mach. Co., D.C.

the earlier judgment equally for the indemnitor or the indemnitee, whichever is the later sued. Thus a judgment for the master in a negligence action protects the servant, Wolf v. Kenyon, 242 App.Div. 116, 273 N.Y.S. 170;[5] Jones v. Young, 257 App.Div. 563, 14 N.Y.S.2d 84; Bisnoff v. Herrmann, 260 App.Div. 663, 23 N.Y.S.2d 719, 721; Lasher v. McAdam, 125 Misc. 685, 211 N.Y.S. 395, affirmed Lasher v. Bieckelhaupt, 217 App.Div. 718, 215 N.Y.S. 876; Jepson v. International R. Co., 80 Misc. 247, 249, 140 N.Y.S. 941, affirmed 163 App.Div. 933, 147 N.Y.S. 1118, affirmed on other grounds 220 N.Y. 731, 116 N.E. 1053; Ritter v. Broff, Sup., 43 N.Y.S. 2d 867, a judgment for a corporation in a conspiracy action protects its agent, Hosinger & Bode, Inc., v. Eleven Franklin Place, Inc., 268 App.Div. 197, 49 N.Y.S.2d 338, a judgment for an employee that he has not breached a contract protects the employer against a claim for inducing a breach, American Button Co. v. Warsaw Button Co., Sup., 31 N.Y.S.2d 395, affirmed 265 App.Div. 905, 38 N.Y.S.2d 570, a judgment for a newspaper in a libel action protects its publisher, Chapman v. Long Island Daily Press Pub. Co., 256 App.Div. 1073, 11 N.Y.S.2d 583. It seems to me reasonably clear that New York is committed to applying the exception along broad lines to accord the defensive protection of estoppel of a former judgment to those whose liability must be founded, if at all, upon just the same issue as has been previously litigated.

Now it would seem to follow that our present case comes within the general purview of the New York cases, for it is hardly as far-reaching as some of the tort cases just considered. For here Philso, the successful litigant in the former action, had incurred whatever liability transferees of the property had for the mortgage debt—a conditional one, since it was enforceable only out of property—long before the defendant, and had passed it on to those from whom defendant acquired his title. So far as concerns the defendant, Philso is the primary obligor in point of time, as well as quite probably in point of incidence of liability. At most, as we have seen, the New York cases require only some possibility or probability of liability over, without examining the particular case to see if such liability actually exists. Here on facts we know or can infer, the possibility of liability over against Philso is surely many times greater than that of the son for the mother in the Good Health case, or the *master* for the *servant* in the Wolf and similar cases. Further, looking at actualities rather than technical definitions, the issue of the former suit here is more basic and freer from other accessory issues, e.g., the effect of contributory negligence, than were those involved in the cited New York cases. I think, therefore, that even on the record as it stands the issue of payment should be considered settled by the former trial. Moreover, even if we assume that when Philso conveyed away the present premises it only *quitclaimed* the interest it then had, I do not see why that would not include such interest as it might find later validated as a consequence of any suit which it might bring against Riordan. At the very least that would seem the intention and consequence of such a conveyance if the action was already pending.

S.D.N.Y., 18 F.Supp. 750; Jones v. Zurich General Accident & Liability Ins. Co., 2 Cir., 121 F.2d 761; Caterpillar Tractor Co. v. International Harvester Co., 3 Cir., 120 F.2d 82, 85, 139 A.L.R. 1, affirming on this point, D.C.N.J., 32 F.Supp. 304, 306, where Clark, J., quotes Jeremy Bentham that, if the mutuality rule itself "is a curious one, the reason given for it is still more so:—

'Nobody can take benefit by a verdict, who had not been prejudiced by it, had it gone contrary': a maxim which one would suppose to have found its way from the gaming-table to the bench."

[5] The Wolf case is cited and followed in Jones v. Valisi, 111 Vt. 481, 18 A.2d 179, and Canin v. Keese, 28 A.2d 68, 20 N.J.Misc. 371.